```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,      )   CR-N-04-30033-MAP
                               )
              Plaintiff,       )
                               )
     vs.                       )
                               )
JAMES ASSELIN                  )
                               )
              Defendant.       )
```

### GOVERNMENT'S RESPONSE TO DEFENDANT JAMES ASSELIN'S MOTION FOR DOWNWARD DEPARTURE

The United States of America, by and through Michael J. Sullivan, United States Attorney for the District of Massachusetts, and Steven H. Breslow, Assistant United States Attorney, hereby files this response to defendant James Asselin's Motion for Downward Departure (Docket No. 351).

This motion, which seeks a concurrent sentence and/or downward departure based on U.S.S.G. § 5G1.3(c) and a downward departure based upon the cooperation of a third party should be denied as meritless.

I.  Background

   A.  The Defendant's Instant Offense

      1.  The Defendant's Offense Conduct

As set forth in far greater detail in the Pre-Sentence Report dated November 22, 2006 (the "PSR"), the defendant participated in a vast and damaging series of crimes centered around the corrupt operation of the Springfield Housing Authority (the "SHA") by his father, Raymond Asselin, Sr.

1

In particular, the defendant pleaded guilty to conspiracy to commit bribery (Count 3), in violation of 18 U.S.C. § 370 and 201; conspiracy to commit theft against the government (Count 85), in violation of 18 U.S.C. § 370 and 641; and conspiracy to commit mail and wire fraud (Count 86), in violation of 18 U.S.C. 370, 1341, 1343, and 1346.

Count 3. In connection with the defendant's gratuities charged in Count 3, the defendant received a wide variety of items, including: lumber and materials for a new deck; the installation of windows and gutters; a General Electric microwave, Jenn-Air stove, and Whirlpool washer and dryer; five maple kitchen cabinet units; and a 1996 Plymouth Voyager Van as well as the payment of excise taxes and insurance for that van. The defendant is ultimately responsible for approximately $39,919 in gratuities.

Count 85. In connection with the defendant's theft charged in Count 85, the defendant is responsible for approximately $66,115.82 in home improvement expenses, automotive repair payments, and other personal expenditures. The automotive repair scheme required the vendor to create fictitious invoices that expensed work on the personal vehicles as work on SHA vehicles.

Significantly, there was a substantial amount of theft attributable to the defendant that simply could not be quantified. For example, after the defendant purchased his home at 16 Dwight Road in approximately 1990, SHA painter Ray Descoteau painted the entire first floor interior of the residence. This consisted of a kitchen, a living room, and a dining room. Descoteau stripped and

then sealed all of the woodwork and molding throughout the first floor.  Finally, Descoteau hung wallpaper border around the kitchen and dining rooms.  Descoteau estimated that this project took a minimum of several weeks, and he performed all of this work on SHA time.

Similarly, an SHA employee also testified that SHA workers painted the entire exterior of 16 Dwight Road shortly after the defendant's purchase of the property.  This SHA employee recalled seeing SHA scaffolding erected around the house and SHA employees scraping and painting the entire house on SHA time.  The SHA employee used to drive by the residence on a daily basis to monitor the progress and estimated that this project took several weeks.

Finally, in the late-1990s, the defendant renovated his attic and converted it into a bedroom for one of his children.  SHA employee Frank Higgonbotham performed the renovation, and did all of the work on SHA time.  SHA employees assisted Higginbotham with the renovation at various times, and did all of the work on SHA time.  The defendant also had heating and plumbing installed in the attic.  Springfield Plumbing supplied the heating and plumbing fixtures for free, and Manny's Plumbing and Heating handled the installation of the heating and plumbing systems.  SHA employees did the painting and wallpapering of the bedroom on SHA time.

<u>Count 86</u>.  In this campaign finance mail and wire fraud scheme, the defendant assisted his brother, Christopher Asselin, in his electoral campaigns for the 12th Hampden District by concealing campaign expenses paid by SHA and SHA contractors, illegal cash

contributions made by various individuals, and labor performed by SHA employees on SHA time from defendant Christopher Asselin's political opponents, the voters of the 12th Hampden District and the general public. PSR, pages 43-47. The estimated loss from this scheme is $40,279.

### 2. The Impact On Victims

Just as the actual loss figures set forth above do not capture the true amount of theft committed by the defendant, the actual loss amounts also do not reflect the true harm caused by the defendant. For example, the harm done to the voters of the 12th Hampden District and the general public as a result of Count 86 is simply immeasurable.

Similarly, as the SHA Board of Commissioners made clear in its Victim Impact Statement dated November 22, 2006 (the "Impact Statement"), "[m]any have been victimized and it will take a very long time to recover. . . . [t]he victim impacts have been severe." Impact Statement, at 1, 7. The Impact Statement demonstrates that the loss figure attributed to any one defendant simply cannot capture the full extent of the harm caused by the defendants' crimes. The defendants' crimes "have broken that essential trust with tenants, vendors, federal and state funding sources, and the general public." Id. at 2. Such damage to the public trust is, literally, incalculable.

As one concrete example of this intangible harm, SHA lost its classification as a high-performing agency, which in turn has resulted in the loss of essential federal funds. Id. at 3. In

order to regain this valuable status and bring the SHA back to even keel, SHA had to devote "[t]housands of hours of time." The Board attests that "[i]t would take a forensic accountant to put a true dollar value on the effort," which cost an estimated "hundreds of thousands of dollars in time and talent." Id. at 3. Moreover, when SHA fails to obtain funding because of its criminal past, "the victims are the seniors and the disabled individuals who are the intended beneficiary" of the funds. Id. at 4.

Further, as many of SHA's buildings are "nearing functional obsolesence," the cupidity of the defendants, who received numerous benefits to their private homes, stands in stark relief. Id. at 5. In sum, as the SHA Board recognized, "the totality of the corruption is jaw-dropping." Id. at 6-7.

    B.    <u>The Defendant's Prior Offense</u>

As set forth in the PSR at pages 64-72, the defendant's prior offense (the "GSEF crime") was completely separate and distinct from the defendant's instant offense (the "SHA crime"). It involved totally different organizations, methods and means, victims, co-conspirators, and time frames. Indeed, the only overlap between the GSEF crime and the SHA crime concerned the defendant's attempt to have his family destroy evidence related to the SHA crime after the FBI searched his house during an investigation of the GSEF crime. PSR ¶ 254.

In the GSEF crime, the defendant and others diverted hundreds of thousands of dollars from the Greater Springfield Entrepreneurial Fund for their own personal gain. Among other schemes, the

defendant and a co-conspirator set up two front companies, J&J Consulting and North Quabbin Enterprises, and then proceeded to cause GSEF to pay themselves "consulting fees" of approximately $332,000. Further, the defendant and his co-conspirators misapplied approximately $159,000 in GSEF funds for personal travel to places like Cancun, Mexico and The Bahamas. Lastly, the defendant and his co-conspirators also formed another fraudulent entity, Ridgewood Place Trust, to which they diverted another approximately $20,100. The total loss from federal funds amounted to approximately $723,000; the victims were the United States Small Business Administration and the United States Department of Commerce.

  C. <u>The Defendant's Prior Uncharged Conduct</u>

  Notably, the defendant engaged in yet other criminal conduct for which he was never charged or punished. For example, although the PSR for the defendant's GSEF offense notes that in 1997 he became Executive Director of the Hampden County Employment and Training Consortium ("HCETC"), where he worked with his co-defendant James F. Krzystofik, PSR at 65, the PSR does not state that the defendant's tenure was marked by significant fraud.[1] HCETC is a conduit for federal program monies, which it loaned to various individuals and entities.

  On approximately May 8, 1997, an individual named William Shenas received a $90,000.00 loan issued under the City of

---

[1] The defendant's role in the fraud was not discovered until after he was sentenced on the GSEF offense, when Kryzstofik informed the government in approximately December 2005.

Springfield's Home Loan Program. Shenas subsequently failed to make payments on the loan, even though he was capable of doing so. According to Krzystofik, at the request of a third party, the defendant directed Krzystofik to write a letter forgiving the balance of the loan on May 8, 1997, even though there was no basis for forgiving the loan.

Moreover, after the Springfield Police Department began to inquire into the propriety of the Shenas loan, the defendant plotted with Krzystofik and Frank Keough[2] to cover up the bogus nature of the forgiveness. On or about July 13, 1999, the defendant arranged for Keough and Krzystofik to draft a false and fraudulent exculpatory letter to the Springfield Police Department to explain why the $90,000.00 loan was forgiven.

The defendant similarly arranged for the fraudulent forgiveness of a $20,000 loan, and the issuance of a follow-up $25,000 loan, to a local attorney named Frank Caruso.

II. The Defendant Does Not Merit A Concurrent Sentence or Downward Departure

    A.    The Defendant's Prior Conviction Is Not A Basis For A Downward Departure or Concurrent Sentence

U.S.S.G. § 5G1.3(c) provides: "(Policy Statement) In any other case involving an undischarged term of imprisonment, the sentence for the instant offense may be imposed to run concurrently,

---

[2] Keough had helped the defendant land his position at HCETC, where he in turn hired Keough's brother to work.

partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense.  U.S.S.G. § 5G1.3(c).

As the First Circuit recognized in United States in Vasquez-Alomar, 342 F.3d 1, 5 (1st Cir. 2003), an exercise of this discretion should ordinarily result in a consecutive sentence:

> The end result need only be 'reasonable.' United States v. Caraballo, 200 F.3d 20, 28 (1st Cir. 1999). The default rule in such situations is for the sentences to run consecutively. See 18 U.S.C. § 3584(a); see also United States v. Quinones, 26 F.3d 213, 216-17 (1st Cir. 1994); United States v. Flowers, 995 F.2d 315, 316-17 (1st Cir. 1993).

Although the Court retains the discretion pursuant to U.S.S.G. § 5G1.3(c) to impose a concurrent or partially concurrent sentence, the consideration of the factors set forth in the Application Note 3(A) of § 5G1.3(c) compel the conclusion that the Court should not exercise this discretion.

First, as set forth above, both crimes were entirely distinct (and serious) offenses that featured totally different organizations, methods and means, victims, co-conspirators, and time frames.  Indeed, the only overlap between the GSEF crime and the SHA crime concerned the defendant's attempt to have his family destroy evidence related to the SHA crime after the FBI searched his house during an investigation of the GSEF crime.  PSR ¶ 254.  These separate and serious offenses each merit separate punishment, particularly since as set forth above neither the GSEF nor the SHA guidelines calculations captured the full extent of the defendant's criminal conduct.  U.S.S.G. § § 5G1.3(c) Application Note 3(A)(I);

18 U.S.C. § 3553(a)(1) (considering the nature of offense and the history of the offender).

Second, separate punishment would reflect the seriousness of each offense, promote respect for the law, and provide just punishment. 18 U.S.C. § 3553(a)(2)(A). Without separate punishment, there would not be adequate deterrence or a sufficient deterrence that the public would be protected. 18 U.S.C. § 3553(a)(2)(B)-(C).

Third, the defendant's release date on the GSEF crime is only seven months away. PSR at 88. U.S.S.G. § § 5G1.3(c) Application Note 3(A)(ii). Thus, the defendant has relatively little time left to serve.

Fourth, the disparate convictions did not result from any deliberate delay by the government, but rather from the ordinary delay attendant with investigating the SHA case and then resolving it through plea negotiations, which in part were delayed so that the defendant could obtain the benefit of the global plea.

Lastly, while defense counsel correctly calculates the defendant's guidelines range by stating that if the GSEF and SHA crimes had been sentenced together, there would have been no increase in the offense level, the SHA grouping would provide a reason for sentencing either at the high end of the guideline range or for an upward departure above the guideline range. PSR at 92-93; Background to Commentary of U.S.S.G. § 3D1.4. The defendant's case is precisely the exceptional case that would call for an upward departure, since grouping the SHA and GSEF crimes - both shocking

cases of corruption with far-reaching public harms - would yield the defendant no additional punishment.

### B. The Defendant Merits No Reduction For Anne Asselin's Role In The Investigation

The Court should also reject the defendant's application for a downward departure for the claimed third-party cooperation of his wife, Anne Asselin. Contrary to the defendant's claim, Ms. Asselin never asserted a marital privilege, opting instead to waive all her privileges in a successful effort to obtain immunity for herself. Any benefits of her candor accrue to her, and should accrue to no one else, certainly not the defendant.

## III. Conclusion

For the foregoing reasons, the Government respectfully asks that the Court impose a consecutive sentence with no downward departure from the Advisory Guidelines Range.

Filed this 27th day of November, 2006.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney


   /s/ Steven H. Breslow
STEVEN H. BRESLOW
Assistant United States Attorney

<u>CERTIFICATE OF SERVICE</u>

Hampden, ss.                              Springfield, Massachusetts
                                          November 27, 2006


    I, Steven H. Breslow, Assistant U.S. Attorney, do hereby certify that I have served a copy of the foregoing by electronically filing and mailing said motion to:

Daniel Kelly, Esq.
101 State Street
Suite 715
Springfield, MA  01103
Counsel for defendant Francis G. Keough

Lori Levinson, Esq.
66 West Street
Pittsfield, MA  01201
Counsel for Defendant Angel T. Guzman

Michael Foy, Esq.
935 Main Street, Suite 203
Springfield, MA  01103
Counsel for Defendant Michael P. Hallahan


                                              /s/ Steven H. Breslow
                                            STEVEN H. BRESLOW
                                            Assistant United States Attorney